IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NICK J. GARDUNO,                    )        No. C 02-5806 JSW (PR)
                                    )
        Petitioner,                 )
                                    )        **ORDER DENYING PETITION**
        vs.                         )        **FOR WRIT OF HABEAS CORPUS**
                                    )
GAIL LEWIS, Warden,                 )
                                    )
        Respondent.                 )
_____    )

## INTRODUCTION

Petitioner, a prisoner of the State of California currently incarcerated at California State Prison-Corcoran in Corcoran, California, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutional validity of his state conviction. On May 5, 2003, the Court ordered Respondent to show cause why the petition should not be granted. Petitioner subsequently sought leave to file an amended petition and to exhaust additional claims in state court. He later filed a third amended petition and on January 26, 2006, this Court ordered Respondent to show cause why the petition should not be granted. On June 26, 2006, Respondent filed a second motion to dismiss the petition since the Supreme Court's decision in *Mayle v. Felix*, 125 S. Ct. 2562 (2005), reversed the Ninth Circuit's holding on which this Court relied in denying an earlier motion to dismiss. On March 22, 2007, this Court granted the motion to dismiss claims two, three and four in the petition as untimely.

On May 30, 2007, Respondent filed an answer to the petition as well as exhibits and a memorandum of points and authorities in support thereof. Petitioner has filed a

traverse, statement of facts and notice of errata with regard to the traverse. Claim one in the third amended petition is now before the Court for consideration on the merits.

### PROCEDURAL BACKGROUND

In April, 2000, a Santa Clara County jury found Petitioner guilty of attempted murder, assault with a firearm and inflicting corporal injury on a spouse. The jury found true allegations that Petitioner personally used a firearm, caused great bodily injury and personally used a firearm causing great bodily injury. Petitioner was sentenced to eight years plus 25 years-to-life.

On June 7, 2002, the California Court of Appeal, Sixth Appellate District, affirmed Petitioner's conviction and sentence in an unpublished opinion. The California Supreme Court denied review on August 23, 2002. Petitioner filed his initial federal habeas petition on December 12, 2002 and his third amended petition on August 15, 2005.

### STATEMENT OF THE FACTS

The facts of the case are summarized from the California Court of Appeal opinion as follows:

> On November 8, 1998, the defendant Nick Garduno and his wife Elena Garduno had been married about a month and lived in his mother's house with his mother and siblings. About 7:15 a.m., the Santa Clara County Sheriff's Department received a call to respond to a shooting incident at the residence. As Deputy Sheriff Wilson arrived, he encountered Elena Garduno coming out of the house, holding her bleeding side. She asked if the ambulance was there and said her husband had accidentally shot her. She denied knowing where the gun was. After the ambulance arrived and the paramedics attended Elena, Deputy Wilson saw defendant coming out of the house. Defendant was extremely concerned about his wife and stated he had accidentally shot her. When asked about the gun, defendant responded that he had thrown it in the house, but did not know where.
>
> Deputy Cheryl Hill then took charge of defendant outside while other deputies entered the house to search for the gun. Defendant continually asked her if he was going to be in trouble and told her the shooting was an accident. He said he knew he was going to be arrested and put in jail. When Deputy Hill asked about the gun, he eventually told her he would show her where it was. They walked to the back bedroom and defendant told Hill the gun was in the crawl space under the house. He said his wife told him to throw the gun under the house. Another deputy retrieved the gun, which had the cylinder out and an expended round beside it. Several

2

deputies searched the living room where the shooting had taken place. Two bullet holes were found in the floor and two spent slugs were booked into evidence. Deputy Hill found two live rounds next to the sofa; another was found by another deputy. Hill noticed two gunshot holes in the fireplace wall, but based on statements by the victim and defendant, she did not think those had been made that morning.

Defendant gave several different stories to the deputies. First he said that he threw the gun down onto the pillows on the floor next to the sofa, it went off, and the shot hit his wife. When the deputies expressed disbelief, he changed his story to say that he was lying on his back on the floor playing with the gun. But there were no bullet holes in the wall underneath the window in the direction defendant said he shot. He then said maybe he was lying on his side or his stomach and the round went into the floor. He insisted he only fired one shot, and said the two bullet holes in the fireplace wall had not been made that morning. Defendant told Deputy Sheriff Sechler that there was something wrong with the gun because the hammer would just fall out by itself and that when he was just cocking the hammer, the gun went off.

Meanwhile, Elena was taken to San Jose Medical Center where she was treated for a close-range through and through gunshot wound to her back above her rib cage. She initially told the trauma team that the gun had gone off by accident. She later told Nurse Storey that she was asleep when the gun went off. When Storey noticed a yellow bruise on her forehead, Elena admitted defendant struck her with his fist about a week before. Elena was interviewed by Deputy Neusel with Sergeant Lemmon in attendance. Sergeant Lemmon took photographs of the victim and observed redness and swelling on her forehead as well as over each of her eyes. Deputy Neusel observed bruising on her face, swelling and redness around both eyes and nose, an older purplish bruise under her left eye. Elena initially told the deputy that all she could remember was that she was sleeping next to her husband when she heard the gun go off, felt pain in her back, stood up and fell down against the fireplace mantle.

Deputy Neusel then asked Elena to repeat her description of what happened because the deputies did not believe her story. Elena looked at Neusel for 15 to 20 seconds, then got teary and started to cry. She said she was unhappy in her marriage, the situation was getting worse because defendant did not have a job and they were together all the time. She said he did not let her go anywhere and did not like her to leave the house. She also said her husband was very controlling and possessive and asked many questions about her former boyfriends. He would become upset and angry when she answered the questions. Elena admitted that defendant had hit her about a week or a week and a half before the shooting. She then described a different version of the shooting, saying they had argued about a former boyfriend. When she turned away on her side to go to sleep, defendant rolled her over and started hitting her face with his right hand. She told him to stop, rolled over with her back to him and then heard a gunshot and felt pain in her back. Elena said she was afraid of her husband and wanted her marriage annulled, but she also said if defendant found out what she had said, she would probably go back to her original story about falling against

3

the mantle. At the end of the interview, the deputies provided her with a domestic violence information card.

Clinical social worker Valerie Williams interviewed Elena the next day. Elena said defendant was drunk and he shot her accidentally during an argument. She also said he had struck her in the face three weeks before. Williams also provided Elena with information on domestic violence resources. Some months later, Elena called Williams and accused her of writing an inaccurate report. She denied saying that defendant shot her.

Deputy Sheriff (now Sergeant) St. Denis spoke with Elena on the morning of the shooting. She claimed not to remember the number of shots and said she did not want to make a police report because she did not want her husband to be prosecuted. She said she told him to hide the gun because she did not want him to get in trouble. She declined the offer of an emergency restraining order. Deputy St. Denis spoke to her again two days later at the house. She claimed not to know how two bullet holes got in the living room floor because defendant shot only once. Several months later, St. Denis encountered Elena outside the courtroom prior to the preliminary hearing. She told him her earlier statements were not true and she was ready to tell the truth. She asked that the interview not be tape-recorded. She then said that the evening before the shooting, she and defendant argued about her past relationships and he hit her on the forehead and left eye. He had also hit her three days earlier. She then described the shooting incident: defendant was lying on the cushions playing with the gun. After he shot at the wall twice, he sat on the couch, placed a small cushion around the cylinder and barrel area and fired another shot into the living room floor toward the window area. As Elena was getting up from the cushions on the floor, she started to roll on her side when she felt a shot in her back. She believed defendant did not intend to hit her although he fired the other three shots intentionally. She did not actually see him fire the shot that hit her.

At trial, Elena testified that the shooting was accidental and that she did not make the statements attributed to her by various witnesses. She admitted that she and defendant sometimes got into yelling arguments, and that he had hit her on the right eye about a week before the shooting. She insisted the incident made her very angry and she went to her parents' house to spend the night. Defendant assured her it would not happen again. Elena further testified that the weekend of the shooting, she and defendant stayed up all night watching television and slept all day, usually on the living room floor on cushions from the sofa. On Saturday evening, they got into an argument over one of her ex-boyfriends and at one point, defendant hit her on the right eye. She was very mad and was yelling at the top of her lungs. Defendant left the room, but later apologized and then spent time in the garage drinking wine with his cousin. About 6 a.m. on Sunday, she and defendant were lying on the cushions on the floor when she first saw him playing with a gun. She had seen him spin the cylinder on the gun before, but could not remember exactly when. About one-half hour later, defendant said he could hit the trophy on the wall above the fireplace and then fired two shots at it. He was lying on his back on the floor. Elena was angry and told him to stop. Defendant then moved to the couch and continued to play with the gun. Then he got a pillow, put it on his lap and continued to play with the gun. Suddenly a shot went past

4

her right shoulder. She again told him to put it away. Finally she laid back down on the cushions and he got up to put the gun away. As she turned over to get up to go to the bathroom, she heard a shot go off and then felt a burning sensation in her back. She saw defendant struggling, like he did not know the gun would go off. They realized she had been hit and both panicked. Defendant called 9-1-1. She told him to hide the gun because she did not want him to get shot at when the police and ambulance arrived.

Elena denied or did not recall making many of the specific statements testified to by Deputy Neusel, Sergeant St. Denis and the social worker. Specifically she denied telling Deputy Neusel that defendant played with guns, or that she was sitting on her right side and just heard the gun go off, or that only one shot had been fired. She denied many of the statements he reported from the interview. She admitted though that she lied when she told emergency workers that she bruised her face falling against the fireplace mantle, because she did not want to deal with the court system. She thought she had told Sergeant St. Denis about all four shots, but she denied many of the other statements he reported. She also denied telling the social worker that defendant had hit her before or that the shooting took place during an argument.

At trial the prosecution presented a criminalist with the Santa Clara County crime lab (Edward Peterson) who was qualified as an expert in the field of firearms and wound ballistics. He identified the gun used as a Ruger, Super Blackhawk revolver chambered for the .44 magnum cartridge. He examined the live and spent cartridges recovered and test fired the gun using various cartridges with no misfires. He noted one defect with the gun, concerning a missing cylinder pin latch, but stated this defect could not have caused the gun to misfire accidentally. He explained his reasoning, and in rebuttal described all of his test fires. He also noted that the design defect found in this gun would only affect the firing if the gun was dropped sharply or the hammer forcefully banged to cause a misfire.

The defense expert Jess Guy, qualified as an expert on the Ruger revolver, had explained the gun had a design defect, but ultimately agreed that it would not accidentally go off when the hammer was cocked.

Both sides introduced testimony from experts in the field of domestic abuse and battered women's syndrome. Dr. Richard Ferry testified for the prosecution. He described the process of domestic violence and the behaviors and psychological process which occur in battered women's syndrome. He noted that the legal process required a woman to suffer at least two beatings for a pattern of abuse to be shown such that she was considered a battered woman, but he personally believed from his experience that even one battering could cause the battered women's syndrome. Dr. Jules Burstein testified for the defense. He explained that for a woman to be suffering from battered women's syndrome, the battering relationship must have existed over a lengthy period of time and that one or two incidents of domestic violence could not create the syndrome.

The defense also included an expert on alcohol and alcohol ingestion who noted defendant's blood alcohol level at 9:48 a.m. after the shooting was .07

5

percent by weight, and opined that his blood alcohol level at the time of the shooting might have been as much as .12 percent by weight. The expert testified this blood alcohol level impaired fine motor skills, as well as perception and thinking, and could increase risk-taking behavior.

*People v. Garduno*, 2002 WL 1272844, at *1-4 (Cal. Ct. App. June 7, 2002) (footnotes omitted).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000)

6

*overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).  In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a Petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal habeas court should conduct an independent review of the record.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

## DISCUSSION

### Claim of Insufficient Evidence

Petitioner argues that there was insufficient evidence to support his conviction for attempted murder, in violation of his right to due process.  Petitioner asserts that, when the evidence is viewed in the light most favorable to the prosecution, the record does not support

his conviction but instead shows that Petitioner "accidentally shot his wife."  Pet. at 9.

The California Court of Appeal rejected Petitioner's claim.  The court made the following findings:

> The evidence showed that the victim was shot at close range and received a through and through gunshot wound to her back above her rib cage. The evidence, viewed most favorably to the verdict, also showed defendant had fired another shot that went past her shoulder as she lay on the floor. The victim admitted to one police officer that defendant had fired the first three shots intentionally, including the shot that hit the floor immediately before she was hit. Both weapons experts agreed that whatever defect the gun had would not have allowed it to misfire simply by cocking the hammer. Defendant had hit the victim at least once or twice during the argument before the shooting, according to the victim, and she had admitted he hit her on one or more previous occasions. To certain witnesses, the victim described defendant as possessive, controlling and jealous of her former boyfriend. These facts reasonably justify the jury's findings and we will not disturb that verdict on appeal. (*People v. Thomas* (1992) 2 Cal.4th 489, 514, 7 Cal.Rptr.2d 199, 828 P.2d 101.)
>
> Although defendant conceded that he had hit the victim and admitted the shooting, he insists the shooting was an accident caused by a defective gun. He emphasizes the various statements made to the police officers by both the victim and himself that the shooting was an accident. He explains that her hesitance to talk to the authorities and her inconsistent statements arose because she did not want her privacy invaded. His inconsistent statements, he claims, were similarly based in his reluctance to admit he had been reckless with the gun. He points out that the prosecution introduced no evidence of threats or actual motive, that no other family members were called as witnesses, and that no testimony on physical evidence, such as blood spatterings or gunshot residue, was offered. Defendant maintains that at most the evidence proved an assault with a deadly weapon. However, these arguments are essentially an invitation to reweigh the evidence, a task not within our function as a reviewing court. (*See People v. Guzman* (1996) 45 Cal.App.4th 1023, 1027, 53 Cal.Rptr.2d 67.)
>
> Moreover, defendant's numerous untrue statements to police officers and his various versions of the incident could cause the jury to see him as less than truthful and thus discount his statements that the shooting was an accident. Defendant also argues that the fact that he struck his wife could not be used to show intent to kill. But that fact could have been used by the jury as evidence of defendant's ongoing use of physical force against his wife when he was angry.

*Garduno*, 2002 WL 1272844, at *6-7.  The appellate court concluded that there was "sufficient evidence to uphold the finding of the trier of fact."  *Id*.

Petitioner now asserts that the California Court of Appeal's rejection of his

insufficient evidence claim violates due process because the court failed to take into account evidence supporting his position that the shooting was accidental. Specifically, Petitioner argues that the court ignored exculpatory testimony from Deputy Sheriff Steven Sechler and the victim. Petitioner highlights Deputy Sheriff Sechler's testimony regarding a statement that he took from Petitioner that the gun malfunctioned, and also Deputy Sheriff Sechler's testimony that the gun lacked a "half-cocked" notch (a design feature that may prevent the accidental discharge of a firearm). Pet. at 11. Petitioner additionally identifies the victim's statements that Petitioner had been shooting trophies on the fireplace mantle just prior to the incident, that Petitioner was simply playing with the gun, and that the victim never felt that she was in danger. *Id.*

### 1.    Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).[1] A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979),[2] which, if proven, entitles him to federal habeas relief, *see id.* at 324; *see, e.g., Wiglesworth v. Oregon*, 49 F.3d 578, 582 (9th Cir. 1995) (writ granted where Oregon procedure of allowing lab reports regarding drug analyses to be admitted into evidence without authenticating testimony relieved state of its burden to prove beyond reasonable doubt all elements of crime charged);

---

[1]*Cf. Fiore v. White*, 531 U.S. 225, 228-29 (2001) (due process violated where basic element of crime not proven because statute did not prohibit defendant's conduct).

[2]It is unreasonable to make a petitioner plead all facts proven at trial and argue that they were insufficient to support the verdict. An allegation that the evidence was insufficient to prove beyond a reasonable doubt an element of the crime is sufficient to warrant service of the petition. *See Williams v. Kullman*, 722 F.2d 1048, 1051 (2d Cir. 1983).

1   *Martineau v. Angelone*, 25 F.3d 734, 739-43 (9th Cir. 1994) (writ granted where evidence

2   found insufficient to convict defendants of child abuse based on delay in seeking medical

3   care for child).

4          A federal court reviewing collaterally a state court conviction does not determine

5   whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne*

6   *v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993). The federal

7   court "determines only whether, 'after viewing the evidence in the light most favorable to

8   the prosecution, any rational trier of fact could have found the essential elements of the

9   crime beyond a reasonable doubt.'" *See id*. (quoting *Jackson*, 443 U.S. at 319). Only if no

10  rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ

11  be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757

12  F.2d 988, 992-93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S.

13  1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th

14  Cir.), *cert. denied*, 469 U.S. 838 (1984).

15         On habeas review, a federal court evaluating the evidence under *In re Winship* and

16  *Jackson* should take into consideration all of the evidence presented at trial. *LaMere v.*

17  *Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented

18  evidence, a habeas court need not confine its analysis to evidence presented by the state in

19  its case-in-chief). If confronted by a record that supports conflicting inferences, a federal

20  habeas court "must presume – even if it does not affirmatively appear on the record – that

21  the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

22  resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore

23  entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

24  Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas

25  court to revisit credibility determinations. *See id*. (credibility contest between victim

26  alleging sexual molestation and defendant vehemently denying allegations of wrongdoing

27  not a basis for revisiting jury's obvious credibility determination); *see also People of the*

28  *Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding

10

conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Uncontradicted testimony is not necessarily undisputed evidence. *United States v. Sandoval-Mendoza*, 472 F.3d 645, 649 (9th Cir. 2006). Jurors may reject uncontradicted testimony when cross examination, other evidence, or their own common sense and ordinary experience convince them the testimony is probably false. *Id*. Even perfectly plausible allegations can be disbelieved if they occur during the course of a generally implausible account. *Id*. (internal quotation marks and citation omitted) (the jury's conclusion that the defendant was not entrapped met the *Jackson* standard, even though he testified that he was entrapped and the informants who allegedly entrapped him did not).

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). Mere suspicion and speculation cannot support logical inferences, however. *Id*.; *see, e.g.*, *Juan H. v. Allen*, 408 F.3d 1262, 1278-79 (9th Cir. 2005) (granting writ where, after resolving all conflicting factual inferences in favor of prosecution, only speculation supported petitioner's conviction for first degree murder under a theory of aiding and abetting).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H.*, 408 F.3d at 1274. Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id*. at 1275 (quoting 28 U.S.C. § 2254(d)).[3] Section 2254(d)(1) plainly applies to *Jackson* cases; that is, if the state court affirms a conviction under *Jackson*, the federal court must decide whether the state court's application of *Jackson* was objectively unreasonable. *Sarausad*, 479 F.3d at 677-78. By contrast, §

_____

[3]Prior to *Juan H.*, the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims. *See Chein v. Shumsky*, 373 F.3d 978, 982-83 (9th Cir.2004) (en banc); *Bruce*, 376 F.3d at 956-57. But in *Juan H.*, the court concluded that "the Supreme Court's analysis in *Williams* compels the conclusion that the state court's application of the *Jackson* standard must be "'objectively unreasonable.'" *Juan H.*, 408 F.3d at 1275 n.13 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)).

11

2254(d)(2) is not readily applicable to *Jackson* cases, because a court under *Jackson* makes no "determination of the facts" in the ordinary sense of resolving factual disputes.  *Id.* at 678.  Rather, the court views the evidence in the light most favorable to the prosecution without resolving any disputed factual questions.  *Id.*  The federal court's task is not to decide whether the state court unreasonably determined disputed facts; it is, rather, to decide whether the state court unreasonably applied the *Jackson* test.  *Id.*; *see id.* at 683 (finding that while state court's characterization of certain testimony was objectively unreasonable, its conclusion that the *Jackson* standard was satisfied was not objectively unreasonable).  Thus, a federal court evaluates a state court's resolution of a *Jackson* sufficiency of the evidence claim in all cases under § 2254(d)(1) rather than § 2254(d)(2).  *Id.* at 2561-62.[4]

The *Jackson* standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.  *Id.*

### 2.   Analysis

The California Court of Appeal's rejection of Petitioner's claim that there was insufficient evidence adduced at trial to support an attempted murder conviction in violation of Petitioner's right to due process, was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

---

[4]The Ninth Circuit has adopted guidelines for applying the "objective unreasonableness" test under § 2254(d)(1) to a state court decision applying *Jackson*: (1) the focus of the inquiry is on the state court decision; (2) even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision; (3) the failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable; (4) the failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and (5) the absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness. *Sarausad*, 479 F.3d at 678.

The California Court of Appeal's application of *Jackson* was not objectively unreasonable.[5] The appellate court took into consideration all of the evidence presented at trial and, "viewing the evidence in the light most favorable to the prosecution," concluded that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Payne*, 982 F.25 at 338 (quoting *Jackson*, 443 U.S. at 319). Under California law, the "essential elements" of attempted murder are "intent to commit the murder," or malice, plus "a direct but ineffectual act towards its commission." *Garduno*, 2002 WL 1272844, at *6. On the element of malice, the appellate court identified a substantial amount of evidence implicating Petitioner, from the victim's testimony that Petitioner physically abused her on numerous occasions, to the testimony of various witnesses who described Petitioner as "possessive, controlling and jealous" of the victim's former boyfriend. *Id.* While most of the evidence on malice was circumstantial, such evidence may be sufficient to sustain a conviction, particularly where it is as abundant as it is in this case. *See Walters*, 45 F.3d at 1355. In terms of "a direct but ineffectual act" towards the commission of the murder, there was testimony from weapons experts who agreed that the gun would not have simply misfired, as Petitioner claimed. *Id.* Combined with the medical records documenting the injuries that the victim sustained, a rational trier of fact could have found, beyond a reasonable doubt, that Petitioner was guilty of attempted murder.

Petitioner's further argument, that the appellate court ignored testimony which did not support the murder conviction in violation of his due process rights, also fails. Under *Sarausad*, it may be objectively unreasonable for a court applying *Jackson* to fail to look to the totality of the evidence, to ignore a key argument of a defendant, or to fail to give appropriate weight to all the evidence. *See Sarausad*, 479 F.3d at 677-78. Petitioner suggests that the California Court of Appeal's review of the trial court's decision failed

---

[5]The California Court of Appeal reviewed the conviction under *People v. Rodriguez*, 20 Cal.4th 1 (1999), a state case that parallels and directly quotes from *Jackson*. *See Rodriguez.* 20 Cal. 4th at 11 (quoting *Jackson*, 443 U.S. at 317-20).

on all three of these grounds. However, this Court finds otherwise. The appellate court considered statements "made to the police officers by both the victim and himself that the shooting was an accident." *Garduno*, 2002 WL 1272844, at 6. The court noted, however, that there were some severe credibility issues surrounding Petitioner's testimony that could "cause the jury to see him as less than truthful and thus discount his statements that the shooting was an accident," namely, Petitioner's "untrue statements to police officers" and his conflicting versions of the incident. *Id*. at 7. On these bases, the jury could have reasonably discredited Petitioner's version of events. The jury's assessment in this regard must be treated with "near-total deference." *See Bruce*, 376 F.3d at 957. Moreover, the appellate court on review was not compelled to take Petitioner's testimony at face value, thereby giving it more weight than the overwhelming evidence in support of the attempted murder conviction.

Petitioner is not entitled to federal habeas relief on his insufficient evidence claim because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

## CONCLUSION

After a careful review of the record and pertinent law, the petition for writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: August 29, 2007

_____
JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

1

NORTHERN DISTRICT OF CALIFORNIA

2

3

4    GARDUNO,                                     Case Number: CV02-05806 JSW

5                    Plaintiff,                   **CERTIFICATE OF SERVICE**

6      v.

7    LEWIS,

8                    Defendant.
     _____/

9

10   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
     Court, Northern District of California.

11

12   That on August 29, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing
     said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery

13   receptacle located in the Clerk's office.

14

15

16   Nick J. Garduno
     P-85673

17   P.O. Box 3471
     Corcoran, CA 93212

18

     Pamela K. Critchfield
19   455 Golden Gate Avenue
     Suite 11000

20   San Francisco, CA 94102-7004

21   Dated: August 29, 2007            *Jennifer Ottolini*

22                                     Richard W. Wieking, Clerk
                                       By: Jennifer Ottolini, Deputy Clerk

23

24

25

26

27

28